**HERMAN JONES LLP**
SERINA M. VASH
153 Central Avenue #131
Westfield, NJ 07090
svash@hermanjones.com
Telephone: (404) 504-6516
Facsimile: (404) 504-6501

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEFF SCHRANZ, Derivatively on Behalf of BECTON, DICKINSON AND COMPANY,<br><br>Plaintiff,<br>v.<br><br>THOMAS E. POLEN, CHRISTOPHER R. REIDY, and VINCENT A. FORLENZA,<br><br>Defendant,<br><br>-and-<br><br>BECTON, DICKINSON AND COMPANY, a New Jersey Corporation,<br><br>Nominal Defendant. | Case No.<br><br>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT<br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Jeff Schranz, located at 13661 Tiverton Road, San Diego, California, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Becton, Dickinson and Company ("BD" or the "Company") against certain of its officers for breach of fiduciary duty, unjust enrichment, and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to BD's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed BD to billions of dollars in potential liability for violations of state and federal law.

2.     BD is a global medical technology company engaged in the development, manufacture, and sale of a broad range of medical supplies, devices, laboratory equipment, and diagnostic products used by healthcare institutions, physicians, life science researchers, clinical laboratories, the pharmaceutical industry, and the general public.

3.     The first page of the Company's Code of Conduct includes a message from defendant Vincent A. Forlenza ("Forlenza"), the Company's Executive Chairman of the Board of Directors (the "Board") and former Chief Executive Officer ("CEO"), who proclaims: "With unwavering commitment to our culture and values, we follow the simple principle: '***We do what is right***.'  This guides every decision we make, every action we take, and every interaction we

have—with our customers, our business partners, our communities, and each other." In reality, flagrant disregard for the law appears to be part and parcel of the Company's standard business practices.   As detailed herein, these practices, ostensibly sanctioned by the Company's fiduciaries, have resulted in BD having to defend itself in multiple lawsuits for violations of U.S. antitrust and securities laws.  Adverse judgments or settlements in these suits could potentially cost the Company hundreds of millions of dollars.

4.      As detailed below, BD has engaged in illegal, anticompetitive business practices to charge supra-competitive prices for conventional and safety syringes and safety intravenous ("IV") catheters.  As a consequence of this unlawful conduct, the Company is now the subject of an antitrust lawsuit pending in the U.S. District Court for the Southern District of Illinois, which alleges that BD conspired with medical supply distributors and group purchasing organizations ("GPOs") to restrain trade in the nationwide market for conventional and safety syringes and safety IV catheters.

5.      BD has also committed violations of U.S. securities laws in connection with its infusion pump system.  On March 17, 2015, BD completed the acquisition of CareFusion Corporation ("CareFusion").  In acquiring CareFusion, BD also acquired CareFusion's Alaris® infusion pump system (the "Alaris System"), a large volume infusion pump that continuously or intermittently delivers fluids, medications, blood, and blood products to adult, pediatric, or neonatal patients.

6.      The Alaris System has a history of faulty operations.  On August 15, 2006, CareFusion recalled numerous models because a sensitive keypad posed a risk of "key bounce" that could lead to over-infusion of patients.  CareFusion suspended production, sales, and repairs

of its Alaris SE infusion pump on August 28, 2006, after the U.S. Food and Drug Administration ("FDA") seized approximately 1,300 units.

7.     The defects of the Alaris SE infusion pump was the result of CareFusion's failure to comply with the FDA's current good manufacturing practice ("cGMP") requirements and Quality Systems ("QS") regulation for medical devices.  Accordingly, CareFusion entered into a consent decree with the FDA on February 7, 2007 (the "Consent Decree").

8.     In June 2007, Alaris System pumps were again recalled for manufacturing defects and sterilization issues, and in October 2007, almost 200,000 Alaris System pumps were recalled because they were at risk for inaccurate flow rates caused by assembly and manufacturing defects.  Ultimately, the Consent Decree was amended in February 2009 to include all Alaris System infusion pumps then produced (the "Amended Consent Decree").

9.     Since acquiring CareFusion, BD has issued numerous recalls for Alaris System devices.  The most recent recall occurred on February 4, 2020, when BD announced a "voluntary recall" of Alaris System pumps to address software issues "through an upcoming software release."

10.     On February 6, 2020, after the market closed, BD filed its Quarterly Report on Form 10-Q for the first quarter ended December 31, 2019 (the "Q1 2020 Form 10-Q") with the SEC.  The Q1 2020 Form 10-Q disclosed that what was previously described as a "software upgrade" for Alaris was a voluntary recall and delay of shipments necessitated by software errors and alarm prioritization matters that resulted in imminent harm to consumers.  The issues were so extensive that BD would "only sell pumps to existing customers who demonstrate a medical necessity for the pumps" and would require the Company to seek regulatory approval in a single comprehensive filing that incorporates "all Alaris software enhancements, recall remediation

updates and changes made to the Alaris system over time[.]"  The Q1 2020 Form 10-Q further disclosed that the recall would cost $59 million and stated that BD "may record incremental charges in future periods associated with this recall."

11.     In the wake of the recall disclosure, BD's stock plunged 13.6%, or $39.08 per share on February 7, 2020, to close at $246.91 per share compared to its February 5, 2020, closing of $285.99 per share, erasing approximately $10.6 billion in market capitalization over two days.

12.     Further, in the three-month period between the announcement of the "improvements" BD would be implementing to the Alaris System and the disclosure that BD would have to halt sales until it obtained regulatory approval for those software changes, certain of the Individual Defendants (as defined herein) profited from the sale of over $58.4 million of their personally held BD stock.

13.     As a direct result of this unlawful course of conduct, BD is now the subject of a federal securities fraud class action lawsuit filed in the U.S. District Court for the District of New Jersey on behalf of investors who purchased BD's shares (the "Securities Class Action").

14.     In accordance with New Jersey law, on April 21, 2020, plaintiff sent a written letter to BD's Board to investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for mismanagement and breaches of fiduciary duties (the "Demand").  A true and correct copy of the Demand is attached hereto as Exhibit A.

15.     Due to a "COVID-related glitch," the Board purportedly did not become aware of the Demand until September 2, 2020.  The Board formed a Special Committee to consider the Demand.  However, other than an introduction by counsel for the Special Committee, and after

repeated urgings the identity of its members, plaintiff has not received any information regarding the Special Committee or its investigation, such as formal documentation setting forth the Special Committee's authority and scope of its investigation, despite specifically requesting such information.  Further, the members of the Special Committee have all been directors for years, including during the heart of the wrongdoing detailed herein.  Thus, they are investigating their own deficient oversight of BD.[1]

16.     Nine months have now passed since plaintiff sent his Demand (and four months since the Board claims it became aware of the Demand), yet the Board has not provided a substantive response despite the obligation under section 14A:3-6.3 of the New Jersey Revised Statutes to respond to the Demand within ninety days.  The Board's failure to timely respond to the Demand is contrary to New Jersey law.  Accordingly, no further delay is warranted or appropriate here, and thus, in accordance with New Jersey law, plaintiff is entitled to pursue this action.

## JURISDICTION AND VENUE

17.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the

_____

[1] The Special Committee members are R. Andrew Eckert ("Eckert"), a director since September 2016; David F. Melcher ("Melcher"), a director since September 2017; and Jeffrey W. Henderson ("Henderson"), a director since August 2018.

exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) BD maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to BD, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

20.     Plaintiff Jeff Schranz was a stockholder of BD at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current BD stockholder.  Plaintiff is a citizen of California.

**Nominal Defendant**

21.     Nominal Defendant BD is a New Jersey corporation with principal executive offices located at 1 Becton Drive, Franklin Lakes, New Jersey.  Accordingly, BD is a citizen of New Jersey.  BD develops, manufactures, and sells medical supplies, devices, laboratory equipment, and diagnostic products worldwide.  The Company operates in three reportable business segments: BD Medical, BD Life Sciences, and BD Interventional.  As of September 30, 2020, BD had approximately 72,000 employees.

**Defendants**

22.     Defendant Thomas E. Polen ("Polen") is BD's CEO and a director and has been since January 2020, and President and has been since April 2017.  Defendant Polen was also BD's Chief Operating Officer ("COO") from October 2018 to January 2020, Executive Vice President and President, BD Medical from October 2014 to April 2017, President, BD Preanalytical Systems from 2009 to 2010; President, BD Diagnostics Systems from 2010 to 2013, and held various positions of increasing responsibility from 1999 to 2010.  Defendant Polen is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.   Defendant Polen knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings.  While in possession of material, nonpublic information concerning BD's true business health, defendant Polen sold almost 13,907 shares of his stock for $ 3,749,744.41 in proceeds.  BD paid defendant Polen the following compensation as an executive:

| Year | Salary | Stock Awards | SAR Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Comp Earnings | All Other Compensation | Total |
|------|--------|--------------|------------|----------------------------------------|-----------------------------------------------------------------|------------------------|-------|
| 2020 | $951,667 | $5,636,380 | $3,749,864 | $1,092,574 | $173,103 | $65,840 | $11,669,426 |
| 2019 | $900,000 | $2,350,983 | $1,551,444 | $900,000 | $200,284 | $37,350 | $6,029,971 |

Defendant Polen is a citizen of New Jersey.

23.     Defendant Christopher R. Reidy ("Reidy") is BD's Executive Vice President, Chief Financial Officer, and Chief Administrative Officer and has been since July 2013. Defendant Reidy is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Reidy knowingly, recklessly, or with

gross negligence made improper statements in the Company's press releases and public filings. BD paid defendant Reidy the following compensation as an executive:

| Year | Salary | Stock Awards | SAR Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Comp Earnings | All Other Compensation | Total |
|------|--------|--------------|------------|----------------------------------------|----------------------------------------------------------------|------------------------|-------|
| 2020 | $775,948 | $2,083,555 | $1,356,122 | $581,961 | $126,766 | $39,017 | $4,918,369 |
| 2019 | $853,874 | $1,732,237 | $1,143,140 | $850,000 | $124,919 | $38,530 | $4,742,710 |

Defendant Reidy is a citizen of New Jersey.

24.     Defendant Forlenza is BD's Executive Chairman and has been since January 2020 and a director and has been since October 2011.  Defendant Forlenza was also BD's CEO from October 2011 to January 2020, Chairman from July 2012 to January 2020, President from January 2009 to April 2017, COO from July 2010 to October 2011, Executive Vice President from June 2006 to January 2009, President, BD Biosciences from March 2003 to June 2006, and Senior Vice President, Technology, Strategy and Development prior to March 2003.  Defendant Forlenza is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.  Defendant Forlenza knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings.   While in possession of material, nonpublic information concerning BD's true business health, defendant Forlenza sold 198,137 shares of his stock for $54,668,240.95 in proceeds.  BD paid defendant Forlenza the following compensation as an executive:

| Year | Salary | Stock Awards | SAR Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Comp Earnings | All Other Compensation | Total |
|------|--------|--------------|------------|----------------------------------------|----------------------------------------------------------------|------------------------|-------|
| 2020 | $1,085,000 | - | - | $1,348,617 | $700,508 | $75,257 | $3,209,382 |
| 2019 | $1,275,000 | $7,267,906 | $4,797,154 | $1,950,000 | $690,010 | $34,563 | $16,014,633 |

Defendant Forlenza is a citizen of New Jersey.

25.     The defendants identified in ¶¶22-24 are referred to herein as the "Individual Defendants."

## BD VIOLATES U.S. ANTITRUST LAWS

**BD Restrains Trade for Conventional and Safety Syringes and Safety IV Catheters**

26.     BD manufactures conventional and safety syringes and safety IV catheters. BD does not sell these products directly to consumers, but to distributors who serve as middlemen between BD and its end users, typically healthcare providers.  The distributors sell BD's products to healthcare providers at prices negotiated between BD and GPOs.  Theoretically, GPOs are supposed to negotiate the best possible price on behalf of the healthcare providers by pooling the healthcare providers' purchasing power to obtain more favorable prices from vendors.  In reality, these interrelated contracts among manufacturers, distributors, and GPOs drive up costs for healthcare providers.

27.     BD has dominant shares in the relevant product markets.  According to data compiled by 360 Market Updates, a market analytics firm, BD is far and away the largest player in the North American disposable syringe market, holding a market share of over 60% and collecting more than 65% of all revenue generated from disposable syringe product sales.  The Company's next biggest competitor in the market for disposable syringes holds only a 10%

market share.  It is alleged that BD controls approximately 55% of the market for safety IV catheters, approximately twice that of its nearest competitor.

28.     Vizient, Inc. and Premier, Inc. are the largest GPOs in the United States.  They do not purchase or sell medical devices.  Rather, they act as intermediaries to negotiate contracts with vendors, such as BD, for the sale of medical devices to the healthcare providers they represent.

29.     Cardinal Health, Inc. ("Cardinal") and McKesson Medical-Surgical Inc. ("McKesson") are distributors who purchase products from BD and resell them to healthcare providers pursuant to terms negotiated by the GPOs.  Collectively, these distributors control a large market share of the distribution of medical devices and supplies.

30.     BD has abused its market power to require the use of oppressive anticompetitive contracts that force supra-competitive prices on the market.  BD conspired with GPOs and distributors to force healthcare providers into long-term exclusionary contracts that restrain trade and inflate the prices of certain BD products.  These actions prevented BD's competitors from obtaining sufficient market share to bid BD's prices down to competitive levels and has suppressed conventional and safety syringe innovation and safety.

31.     The contracts are designed by BD and its co-conspirators to restrict trade to their benefit and at the expense of healthcare providers.  These restrictive contracts generally contain sole or dual sourcing provisions or disloyalty penalties.  Sole sourcing provisions require that a healthcare provider, which is a member of a GPO, purchase only BD products.  Dual sourcing provisions allow the healthcare provider to purchase from only one other approved non-BD manufacturer.  Disloyalty penalties punish healthcare providers with higher prices if they switch from BD to a competitor.

32.     BD and the GPOs enter into a "Net Dealer Contract" that sets the terms under which healthcare providers, who are members of the GPOs, buy BD products.  In exchange, BD pays the GPOs millions of dollars in anticompetitive payments.  These contracts contain a penalty pricing rebate that punishes healthcare providers who do not purchase a certain volume of their prior BD purchases, often contain sole or dual source provisions, and are long-term, lasting between three and five years.

33.     Once a healthcare provider decides to purchase BD products pursuant to the terms of the Net Dealer Contract negotiated by its GPO, it selects a distributor to deliver BD's products.  The distributors and healthcare providers enter into a "Distributor Agreement," which typically require the distributors to enforce the requirement that the healthcare providers buy a certain volume of BD products or pay the penalty set forth in the Net Dealer Contract.

34.     BD then enters into a "Dealer Notification Agreement," which furthers the conspiracy in several ways.  First, the distributors agree to distribute BD's products to healthcare providers pursuant to the Net Dealer's anticompetitive terms.  Second, the distributors agree to enforce BD's penalty pricing system that punishes healthcare providers from moving away from BD products to competitor products.  Finally, the distributors agree to make additional anticompetitive cash payments to the GPOs based on the volume of BD sales under the Net Dealer Contract.

35.     In addition, BD pays extra commissions to the distributors' sales personnel who sell BD products to the exclusion of competitors' products.  BD requires that distributors' promotional material emphasize BD as the preferred brand.  And, BD asks distributors to not induce a BD customer to purchase a competitors' products.

36.     High barriers to entering the relevant markets protect the conspiracy.  Healthcare providers rely heavily on GPOs and have reduced their in-house procurement capabilities. Without the ability to negotiate contracts on their own, they must accept the long-term, exclusionary GPO contracts.  Second, any competitor would have to produce enormous amounts of syringes and catheters for its costs to be competitive with BD, which produces billions of conventional and safety syringes and safety IV catheters per year worldwide.  Finally, regulatory barriers such as patents and FDA approval requirements make it difficult to enter the relevant markets.

37.     BD also enters into exclusionary contracts with healthcare providers outside of the GPO system.  In these contracts, BD bundles the rebates offered for many types of BD products and requires a healthcare provider to buy certain quotas to keep all the rebates.  Because of BD's broad range of products, healthcare providers will not choose a non-BD conventional and safety syringe or safety IV catheter for fear of paying higher prices on BD's other medical supplies.

38.     This scheme is engrained in BD's culture.  The sale of conventional and safety syringes and catheters is reported through BD's Medical segment.  The sale of these products contribute a substantial financial amount to BD's bottom line.

39.     In addition, distributors are a key part of BD's business.  As noted in the Company's Annual Report on Form 10-K for its fiscal year ended September 30, 2019 (the "2019 Form 10-K") filed with the SEC on November 27, 2019, BD's "products are marketed and distributed in the United States and internationally *through independent distribution channels*, and directly to hospitals and other healthcare institutions by BD and independent sales representatives."  Accordingly, BD acknowledges the necessity of distribution channels to get its

products to market, indicating not only an awareness of the exclusionary contracts, but approval of them.

40.     The 2019 Form 10-K's references to the competition among medical device suppliers also telling, stating:

**Competition**

BD operates in the increasingly complex and challenging medical technology marketplace. Technological advances and scientific discoveries have accelerated the pace of change in medical technology, the regulatory environment of medical products is becoming more complex and vigorous, and economic conditions have resulted in a challenging market. Companies of varying sizes compete in the global medical technology field. Some are more specialized than BD with respect to particular markets, and some have greater financial resources than BD. New companies have entered the field, particularly in the areas of molecular diagnostics, safety-engineered devices and in the life sciences, and established companies have diversified their business activities into the medical technology area. Other firms engaged in the distribution of medical technology products have become manufacturers of medical devices and instruments as well. Acquisitions and collaborations by and among companies seeking a competitive advantage also affect the competitive environment. In addition, the entry into the market of low-cost manufacturers has created increased pricing pressures. BD competes in this evolving marketplace on the basis of many factors, including price, quality, innovation, service, reputation, distribution and promotion. The impact of these factors on BD's competitive position varies among BD's various product offerings. In order to remain competitive in the industries in which it operates, BD continues to make investments in research and development, quality management, quality improvement, product innovation and productivity improvement in support of its core strategies. See further discussion of the risks relating to competition in the medical technology industry in Item 1A. Risk Factors.

*     *     *

The medical technology industry has also experienced a significant amount of consolidation, resulting in companies with greater scale and market presence than BD. Traditional distributors are also manufacturers of medical devices, providing another source of competition. In addition, health care systems and other providers are consolidating, resulting in greater purchasing power for these companies. As a result, competition among medical device suppliers to provide goods and services has increased. Group purchasing organizations and integrated health delivery networks have also served to concentrate purchasing decisions for some customers, which has led to downward pricing pressure for medical device suppliers. Further consolidation in the industry

could intensify competition among medical device suppliers and exert additional pressure on the demand for and prices of our products.

41.     Notably, defendants Reidy and Forlenza signed the 2019 Form 10-K, as did Special Committee members Eckert, Henderson, and Melcher.  While defendant Polen did not sign the 2019 Form 10-K, he was at that time the Company's COO and President.  It was also already determined that he would become the CEO in 2020, as the 2019 Form 10-K specifically states.

42.     Further acknowledgement of BD's "key distributors" shows the importance of the oppressive contracts on BD's bottom line.  In particular, the 2019 Form 10-K states:

> The effects of weather, regulatory or other events that adversely impact our supply chain, including our ability to manufacture or products (particularly where product of a product line or sterilization operations are concentrated in one or more plants), source materials or components or services from suppliers (including sole-source suppliers) that are needed for such manufacturing (including sterilization), or provide products to our customers, ***including events that impact key distributors***.

43.     The above-stated importance of distributors demonstrates that the Individual Defendants would be keenly aware of any agreements with distributors that furthered the wrongful antitrust conduct, such as with Cardinal and McKesson.

44.     As a direct consequence of this unlawful conduct, BD is now the subject of an antitrust lawsuit pending in the U.S. District Court for the Southern District of Illinois captioned *Marion HealthCare, LLC, et al. v. Becton Dickinson & Company, et al.* (the "Vertical Conspiracy Action").

45.     The Vertical Conspiracy Action is brought by healthcare providers who purchased BD's products, and alleges that BD violated U.S. antitrust laws by conspiring with medical supply distributors and GPOs to restrain trade in the nationwide markets for conventional and safety syringes and safety IV catheters.  Though the district court granted a motion to dismiss the

- 14 -

plaintiffs' amended complaint on March 5, 2020, the 7th Circuit Court of Appeals vacated the district court's judgment, finding that, the dismissal depended on an error of law and remanded the action for further proceedings.  As a result, the Company will be forced to continue to bear the cost of investigating, defending, and potentially settling (or paying treble damages in an adverse judgment for) the Vertical Conspiracy Action.

**The Antitrust Scheme Violates the Company's Code of Conduct**

46.     BD's Code of Conduct is preceded by a signed statement by defendant Forlenza. In conclusion he states: "Our Code of Conduct provides direction on how we can live our values. ***Just as I base my behavior on our cultural priorities and the Code's guidance***, we expect everyone at BD to do the same.  Nothing is more essential for our success and for fulfilling our Purpose and potential."

47.     The Code of Conduct devotes a section to BD's "Customers and Marketplace."  In discussing its customers, BD proclaims to "Play[] Fair."  BD elaborates by explaining:

> What we believe
> We will succeed as a business because we have ideas and technology that meet the needs of customers and patients.  ***We are fair and honest when we do business.  We follow the laws that govern how companies compete and behave with each other.***
>
> Why it matters
> Fair competition laws, such as antitrust laws, promote healthy competition and protect customers from unfair business practices.  We will win in the marketplace based on the value of our products and services.
>
> How we do what is right
> Do
> • ***Treat everyone fairly, avoiding any false or dishonest practices***
> • Seek help from the Law Group if we want to compare our situation with a competitor or are unsure about how to act with competitors
>
> Don't
> • Discuss pricing, contract terms, or marketing/sales strategies with competitors
> • Agree with competitors to divide markets, territories, or customers

• ***Use our category position in an illegal or unethical manner to reduce, prevent, or eliminate competition***
• Make agreements with customers or sales channels like distributors to restrict resale prices
• Make false claims or disparaging comments about our competitors' products or intentionally interfere with their business relationships

48.     In this section's "Authentic answers" call out, it states:

Saying things like "crush the competition" may seem like just an expression of enthusiasm.  However, it could also be seen by regulators as a sign of illegal business practices.  It can also create a culture where people think winning is the only goal, and as a result start using deceptive or unfair tactics.  Instead, focus on the value and benefits of our products and services.  We succeed in business because we have new and useful ideas and technology.  That's what separates us from the competition.

## BD VIOLATES U.S. SECURITIES LAWS

**History of Known Issues with the Alaris System**

49.     BD is a global medical technology company that develops, manufactures, and sells a broad range of medical supplies, devices, laboratory equipment, and diagnostic products worldwide.

50.     On March 17, 2015, BD completed the acquisition of CareFusion.  In acquiring CareFusion, BD also acquired CareFusion's Alaris System, a large volume infusion pump that continuously or intermittently delivers fluids, medications, blood, and blood products to adult, pediatric, or neonatal patients.

51.     The Alaris System has a history of faulty operations, resulting in CareFusion entering in to the Consent Decree with the FDA on February 2007 and the Amended Consent Decree in February 2009.  The initial Consent Decree was necessitated by CareFusion's failure to maintain compliance with the FDA's current cGMP requirements and QS regulation for medical devices.  Specifically, on August 15, 2006, CareFusion initiated a voluntary field corrective

action of its Alaris SE infusion pump because a sensitive keypad posed a risk of "key bounce" that could lead to the over-infusing of patients.

52.     On August 28, 2006, CareFusion suspended production, sales, and repairs of its Alaris SE infusion pump after the FDA seized approximately 1,300 units at its manufacturing facility in San Diego, California.   CareFusion entered into the initial version of the Consent Decree and resumed manufacturing and sale of its Alaris SE pump.

53.     Shortly thereafter, FDA investigators found similar QS deviations relating to another line of CareFusion's infusion pumps.   These additional violations resulted in the Amended Consent Decree in February 2009, which covered all of CareFusion's infusion pumps.

54.     BD inherited the duty to abide by the terms of the Consent Decree when it acquired CareFusion.   Under the terms of the Consent Decree, BD must comply with the FDA's cGMP requirements and QS regulations in the designing, manufacturing, processing, packing, repacking, labeling, holding, or distributing of its infusion pumps.   BD must also retain an independent expert consultant to inspect all of its infusion pump facilities and recall procedures. Finally, the Consent Decree authorizes the FDA, in the event of future violations, to order BD to cease manufacturing and distributing, recall products, and take other actions.

**Previous Recalls of the Alaris System**

55.     Even after entering into the Consent Decree, the Alaris System struggled with defects.   Over the past five years, the Company has issued numerous recalls for Alaris System devices registered under FDA 510(k) submission number K051641 as follows:

| Product | Date Recall Initiated | Manufacturer Reason for Recall | FDA Determined Cause |
|---|---|---|---|
| Alaris PC unit model 8015, Infusion pump; software version 9.17 | 5/13/2015 | An issue with the cancel functionality used during atypical infusion programming to cancel user inputted values. An infusion may start that is greater than or less than the hospital established limits for the specific medication. | Software design |

| Alaris PC Unit, Infusion Pump Model 8000, Part No. TC10005092 | 2/12/2016 | CareFusion is recalling the Alaris PC unit because a component on the PC unit power supply may cause a "System Error" or "Missing Battery" error code (120.4630). | Under investigation by firm |
|---|---|---|---|
| Alaris PC unit, Model 8015; central programming, monitor and power supply component for the Alaris System | 3/24/2016 | The Alaris PC units model 8015 may display a system error code 133.6080 due to failure with the super capacitor (C245) at power up on the Alaris PC unit logic boards. | Nonconforming material/component |
| Alaris System PC Unit Model 8015 with software versions 9.17 and 9.19; central programming, monitoring and power supply component for the Alaris System. | 5/12/2016 | A patient weight can be populated incorrectly under certain conditions when using the RESTORE feature to restore infusions running on the Alaris LVP module model 8100 and the Alaris Syringe module model 8110. | Software design |
| Alaris System PC unit, model no. 8000 and 8015; central programming, monitoring and power supply component for the Alaris infusion pump System. | 11/1/2016 | Reports where the Low Battery alarm and/or the Very Low Battery alarm are not being triggered before the battery is discharged and all infusion channels are stopped. | Use error |
| Alaris PC Unit, Model 8015 | 6/12/2017 | BD initiated the recall of Alaris PC unit model 8015 after the firm identified five scenarios which can result in the occurrence of Systems Error Code 255-16-275 and can potentially result in interrupted infusions. | Software design |

56.     The FDA classifies product recalls into a numerical designation (I, II, or III) to indicate the relative degree of health hazard presented by the product being recalled. The recalls listed above were designated as Class II by the FDA. A Class II recall is defined as a "situation in which use of, or exposure to, a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote."

57.     On February 4, 2020, BD announced a recall of its Alaris System. The FDA ultimately designated the recall as Class I. A Class I recall is defined as "a situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause

serious adverse health consequences or death."  Accordingly, the FDA deemed that the defects involving the Alaris System's software errors and alarm prioritization issues were potentially life threatening and more critical than the issues that resulted in the six recalls noted above.

58.     BD failed to be forthright with investors regarding multiple issues with the Alaris System that would materially affect the Company's financial position.  Specifically, between November 5, 2019 and February 5, 2020, BD made a series of false and misleading statements that omitted that: (i) large numbers of its Alaris System units had experienced software errors and other alarm prioritization matters that resulted in serious injury and death; (ii) as a result of these issues, the Company would have to invest in remediation efforts to correct the defects; (iii) such remediation efforts would likely be delayed due to regulatory scrutiny in connection with the Consent Decree; and (iv) the Company would likely need to initiate a costly recall of the defective pumps and halt sales until remediation efforts were completed.

## **IMPROPER STATEMENTS**

59.     Beginning on November 5, 2019, the Company and its fiduciaries made a series of false and misleading statements regarding the true extent of the issues with the Alaris System and how those issues would affect the Company's financial position.  On November 5, 2019, BD issued a press release announcing BD's fourth quarter and full year 2019 financial results and fiscal 2020 guidance.  If particular, the press release stated:

> BD (Becton, Dickinson and Company) (NYSE: BDX), a leading global medical technology company, today reported quarterly revenues of $4.584 billion for the fourth fiscal quarter ended September 30, 2019.  This represents an increase of 4.1 percent over the prior-year period.  On a comparable, currency-neutral basis, revenues increased 6.2 percent over the prior-year period.

> For the full fiscal year ended September 30, 2019, revenues of $17.290 billion increased 8.2 percent from the prior-year period.  On a comparable, currency-neutral basis, full fiscal year revenues of $17.281 billion grew 5.1 percent.

*      *      *

**Fiscal 2020 Outlook for Full Year**
The company expects full fiscal year 2020 revenues to increase 4.0 to 4.5 percent as reported, or 5.0 to 5.5 percent on a currency-neutral basis.

The company expects full fiscal year 2020 adjusted diluted earnings per share to be between $12.50 and $12.65.  This represents growth of approximately 9.5 to 11.0 percent on a currency-neutral basis over fiscal 2019 adjusted diluted earnings per share of $11.68, or growth of approximately 7.0 to 8.5 percent including the estimated unfavorable impact of foreign currency.  Adjusted diluted earnings per share guidance includes an adverse impact of approximately 500 basis points related to the expiration of the Gore royalty.

60.     In a conference call with analysts and investors held the same day to discuss BD's fourth quarter and full year 2019 financial results, Company fiduciaries misleadingly referred to planned "improvements" and "upgrades" to the Alaris System's alarm prioritization and optimization.  These species statements characterized the imminent remediation of critical failure with certain Alaris System devices as ambiguous "upgrades" without disclosing why those upgrades were necessary.  Moreover, the statements made by defendant Reidy made it seem that the "upgrades" would simply shift the timing of certain sales.  Specifically, defendant Reidy stated:

> From a phasing perspective, we expect revenue growth in the first half of the fiscal year to be approximately 100 basis points below the full year guidance range driven by first quarter revenue growth of 1% to 2%. *In our MMS business, we are planning to make some improvements to our Alaris pump software, including upgrades to alarm prioritization and optimization. We are in discussions with the FDA about the timing of implementation of these upgrades and the possibility of bundling them with a new software version release.* This is expected to move the timing of some sales from Q1 to the balance of the fiscal year.

61.     When asked for further detail on the impact of the Alaris software changes to revenue, defendant Reidy responded that "revenue growth [is expected] to be between 1% and 2%, and one of the drivers of that is the timing of the upgrades on the Alaris pump software."

Moreover, despite "the 1% to 2% growth in the first quarter, [management] expect[s] the first half to be relatively close to guidance to within 100 basis points."

62.    On the call, defendant Polen touted Alaris as the "clear leader and product choice," stating:

> So just a note. As you know, Alaris is the clear leader and product choice in, not only the infusion market, but also as part of a broader Medication Management Solution that our customers are investing in. ***And it's part of our process and our strategy in the business to continually iterate and make enhancements to the platform.*** And so you've seen us do that certainly on the hardware side with significant investments, such as the new Alaris M2 pump launch, which has been extremely well received by our customers. ***And we've been making those same type of investments in software upgrades over the last couple of years. And this upgrade right here is a continued reflection on those investments and will be forthcoming.***
>
> I would just say in terms of momentum, maybe just one other comment there on your question, we saw in FY '19 near or at, I'd say, record levels of continued share gain both in the infusion and the dispensing business, so about 200 basis points of gain in infusion and 100 in dispensing. ***And we see no slowdown in that momentum.***

63.    On November 21, 2019, Company fiduciaries presented at the Jeffries London Healthcare Conference.   During the presentation, they again made misleading statements regarding planned "upgrades" to the Alaris System without disclosing that those upgrades were necessary because certain Alaris System devices were experiencing critical software errors that could "cause serious adverse consequences or death" and would likely require a costly recall of the defective units.   Specifically, John E. Gallagher, BD's Senior Vice President, Corporate Finance, Controller, and Treasurer, stated:

> As far as Q1 phasing, we did call out Q1 being a 1% to 2% grower.  There are a number of dynamics there that are driving it, which effectively create a bit of an imbalance first half, second half.  Meaning with a 1% to 2%, we're expecting the first half to be about 4%, the back half to be about 6%.  And the key factors are - - one is DCBs.  We haven't lapped that yet, so that's an impact to Q1.  We talked - - Simon just mentioned China.  On basic medical devices, we're seeing some pricing pressure due to some cities changing some tender processes.  We called

that out in our MDS business.  That will impact Q1.  We are also seeing some price on diabetes care.  We have a tough comp in Pharma Systems.  But probably one of the larger ones to call out as well is Alaris pumps.  We're upgrading some software.  This is in our MMS business, our infusion pumps.  ***We're upgrading some software in the pumps, and that will delay some installations and shipment into the subsequent quarters, and we anticipate get all of that back inside of the fiscal year.***  So that's what's driving the Q1 being at that 1% to 2%.  So there's some comps in there, and there's also some factors that are going to be some timing within the year.

64.     On November 27, 2019, the Company filed its 2019 Form 10-K.  In particular, the

2019 Form 10-K stated:

**Defects or quality issues associated with our products could adversely affect the results of our operations.**

The design, manufacture and marketing of medical devices involve certain inherent risks.  Manufacturing or design defects, component failures, unapproved or improper use of our products, or inadequate disclosure of risks or other information relating to the use of our products can lead to injury or other serious adverse events. These events could lead to recalls or safety alerts relating to our products (either voluntary or as required by the FDA or similar governmental authorities in other c countries), and could result, in certain cases, in the removal of a product from the market. A recall could result in significant costs and lost sales and customers, enforcement actions and/or investigations by state and federal governments or other enforcement bodies, as well as negative publicity and damage to our reputation that could reduce future demand for our products. Personal injuries relating to the use of our products can also result in significant product liability claims being brought against us. In some circumstances, such adverse events could also cause delays in regulatory approval of new products or the imposition of post-market approval requirements.

65.     As to the Amended Consent Decree, the 2019 Form 10-K stated, in particular:

While this BD organizational unit remains subject to the amended consent decree, which includes requirements of the original consent decree, it has made substantial progress in its compliance efforts.  However, we cannot predict the outcome of this matter, and the amended consent decree authorizes the FDA, in the event of any violations in the future, to order us to cease manufacturing and distributing infusion pumps, recall products and take other actions…

We also cannot currently predict whether additional monetary investment will be incurred to resolve this matter or the matter's ultimate impact on our business. We may be obligated to pay more costs in the future because, among other things, the FDA may determine that we are not fully compliant with the amended consent

decree and therefore impose penalties under the amended consent decree, and/or we may be subject to future proceedings and litigation relating to the matters addressed in the amended consent decree. *As of September 30, 2019, we do not believe that a loss is probable in connection with the amended consent decree, and accordingly, we have no accruals associated with compliance with the amended consent decree.*

*     *     *

As a result of the CareFusion acquisition, we are operating under a consent decree with the FDA relating to our U.S. infusion pump business. The consent decree authorizes the FDA, in the event of any violations in the future, to order us to cease manufacturing and distributing products, recall products or take other actions, and we may be required to pay significant monetary damages if we fail to comply with any provisions of the consent decree.

66.     The 2019 Form 10-K was signed by defendants Reidy and Forlenza and included signed certifications by defendants Reidy and Forlenza pursuant to the Sarbanes-Oxley Act of 2002 that the report was accurate and did not omit to state material facts necessary to make the statements not misleading.

67.     The statements referenced above were improper. Specifically, they failed to inform investors that: (i) large numbers of its Alaris System devices had experienced software errors and other alarm prioritization matters that could "cause serious adverse consequences or death"; (ii) BD's quality systems and controls did not comply with FDA requirements and more specifically, with the Consent Decree; (iii) as a result of these issues the Company would have to invest in remediation efforts to correct the defects; (iv) the Company would likely need to initiate a costly recall of the defective Alaris System devices; and (v) as a result of the foregoing, the Company's fiscal 2020 guidance was materially misleading.

## THE TRUTH EMERGES

68.     On February 4, 2020, BD announced a "voluntary recall" to address software issues with its Alaris System. The posting on the Company's website stated: "BD intends to

address the issues through an upcoming software release.  BD will update the software for affected devices at no charge and will contact affected customers to initiate the scheduling process for the software update when the software becomes available."

69.     Then, only two days later, on February 6, 2020, BD announced its financial results for the first quarter ended December 31, 2019.  The press release disclosed that BD was working with the FDA on a software remediation plan for the Alaris System, the remediation plan would require additional regulatory filings beyond what the Company had previously anticipated, and as a result the Company was lowering its previously issued guidance for fiscal 2020 revenue and adjusted diluted earnings per share.  In particular, the press release stated:

> BD (Becton, Dickinson and Company) (NYSE: BDX), a leading global medical technology company, today reported quarterly revenues of $4.225 billion for the first fiscal quarter ended December 31, 2019. This represents an increase of 1.6 percent as reported over the prior-year period, or 2.5 percent on a currency-neutral basis.
>
> ***BD also announced today that it is continuing to work with the U.S. Federal Drug Administration (FDA) on its software remediation plan for the Alaris System, which will require additional regulatory filings beyond what the company previously anticipated. The company expects to submit its comprehensive regulatory filing in the fourth quarter of fiscal year 2020. In the interim, the company will partner with the FDA and existing customers to ensure continued access to the Alaris System under medical necessity.*** As a result, the company is lowering its full fiscal year revenue and adjusted diluted earnings per share guidance.
>
> "In the first quarter, the BD team delivered solid results, in line with our expectations," said Tom Polen, CEO and president. "As we look ahead to the balance of the fiscal year, we are focused on the resolution of the Alaris pump matter. We stand behind the safety of the Alaris System, which is used in the care of 70 percent of patients undergoing infusion therapy. Now, we need to take the necessary steps to meet the FDA's expectations with respect to the Alaris System. We are committed to doing what is right for customers, patients and shareholders. You can expect that our purpose and values will always be at the core of who we are and how we work to resolve this situation moving forward."

*       *       *

**<u>Fiscal 2020 Outlook for Full Year</u>**
The company is lowering its full fiscal year 2020 revenue and adjusted diluted earnings per share guidance to reflect the impact of the remediation effort and anticipated loss of sales of the Alaris infusion system.

The company now expects full fiscal year 2020 revenues to increase 1.5 to 2.5 percent as reported, or 2.5 to 3.5 percent on a currency-neutral basis.

The company now expects full fiscal year 2020 adjusted diluted earnings per share to be between $11.90 and $12.10. This represents growth of approximately 4.0 to 5.5 percent on a currency-neutral basis over fiscal 2019 adjusted diluted earnings per share of $11.68, or growth of approximately 2.0 to 3.5 percent including the estimated unfavorable impact of foreign currency. Adjusted diluted earnings per share guidance includes an adverse impact of approximately 500 basis points related to the expiration of the Gore royalty.

70.     The Alaris System recall received much attention on the BD's earnings conference call held the same day.  Initially, defendant Polen explained that the Company was required to seek regulatory approval for the software enhancements, stating:

In November, we told you we were planning to make some improvements to our Alaris pump software, including upgrades to alarm prioritization and optimization. We indicated then that we were in active discussions with the FDA about the timing and implementation of these improvements. Relying on our quality process within the Infusion business and how we've managed Alaris software updates over time, the team believed we could take a phased approach to releasing Alaris software updates and that these releases did not require a 510(k) clearance.  We then issued the first phase of our software updates in December, and we resumed shipping, as we shared with you last month.

Through our ongoing dialogue with the FDA, including in-depth discussion this past Monday, we learned that the FDA disagreed with our conclusion about the need for a new 510(k) clearance for these software upgrades. ***And in light of the consent decree, the FDA has requested that we combine all Alaris software enhancements, recall remediation updates and changes made to the Alaris system over time into a single comprehensive 510(k) filing, which we're going to submit in the fourth quarter of FY '20.*** We're actively continuing to collaborate with the FDA to ensure we meet their expectations for this upcoming regulatory submission.

I want to be clear here that while we relied on our infusion quality process and system, we have now learned that in this case, it did not meet FDA's expectations, and we're committed to taking the appropriate actions to get this right.

71.     During the call, at least one analyst questioned how the Company "got caught offguard and how this went from sort of a software upgrade to something much more significant."  In response, defendant Polen explained that the "specific quality process within the Infusion business within the consent decree that the team was following [] said each of those individual changes didn't require a 510(k) process, but the FDA requires that "you actually need to put in a 510(k) given the series of changes that have been made."

72.     Finally, defendant Polen admitted that the Company had failed to obtain FDA approval in connection with its prior upgrades to the Alaris System, stating:

> So as I mentioned, based on the quality system in our Infusion business, we've made software upgrades over time to the Alaris system. And over that period of time, we're talking -- not this year, *we're talking a number of years, our quality process determined that those upgrades that we've been making in that business did not require a 510(k) clearance. And so most recently, on the most recent changes and updates that we made, we followed that same process.* And our team determined based on that process that those recent updates in November also did not require a new 510(k) clearance. And so we released that software
>
> Since what we've learned, and as I mentioned, we had a key meeting with the FDA as recently as this Monday, through our ongoing dialogue with the FDA, we learned that *the FDA disagreed with that determination about the need for a new 510(k) clearance for the updated software. And that applies not just to the upgraded software that we're talking about in November, but that decision process that had occurred over time.* And so as I said, we're collaborating with the FDA on their request to combine all the Alaris software enhancements and remediation upgrades with the additional changes made to the Alaris system over time, right, over years, into a more comprehensive regulatory filing, which is going to be submitted this summer. And so while you're right, we are ready to -- we have the information ready for the recent software upgrades, we are -- *the work that has to take place between now and the submission date is more in reference to the historical changes that have been made over multiple years going back, and the -- some additional testing that we need to do on those historic changes to reflect the testing requirements today.* So that's the work that has to be done.

73.     After the market closed on February 6, 2020, BD filed its Q1 2020 Form 10-Q with the SEC.  The Q1 2020 Form 10-Q disclosed that on February 4, 2020, the Company had

initiated a voluntary recall of certain Alaris System devices in order to address software errors

and other alarm prioritization matters, and that the recall would cost an estimated *$59 million*.  In

particular, the Q1 2020 Form 10-Q stated:

> On February 4, 2020, the Company initiated a voluntary recall of certain Alaris™ pump systems in order to address software errors and other alarm prioritization matters. The estimated cost of this recall of $59 million was recorded to ***Cost of products sold*** during the three months ended December 31, 2019. The Company may record incremental charges in future periods associated with this recall.
>
> *         *         *
>
> First quarter Medical segment revenues were unfavorably impacted by the Medication Management Solutions unit's delay of shipments of Alaris™ infusion pumps pending compliance with certain regulatory filing requirements of the U.S. Food and Drug Administration ("FDA"). Currently, BD will only sell pumps to existing customers who demonstrate a medical necessity for the pumps. As a result, we expect revenues from our Medication Management Solutions unit for the current fiscal year to decline significantly compared to the prior year. We expect the filing with the FDA to be made in BD's fourth fiscal quarter.

74.     On this news, BD's market capitalization plunged 13.6% over two trading days,

from its closing price of $285.99 per share on February 5, 2020, to close at $246.91 per share on

February 7, 2020, a decline of $39.08 per share, erasing approximately $10.6 billion in market

capitalization.

75.     On March 6, 2020, the FDA categorized BD's "voluntary" recall with a Class I

recall designation, which refers to situations where use of the device could cause serious injury

or death.  The recall impacted over 75,000 devices.

76.     In addition, as a result of the Company's fiduciaries' improper statements detailed

herein, the Company is now the subject of the Securities Class Action on behalf of investors who

purchased BD shares at artificially inflated prices.  The Securities Class Action seeks claims

against BD and the Individual Defendants in connection with the Company's improper

statements detailed herein, including causes of action under sections 10(b) and 20(a) of the

Exchange Act.  The Securities Class Action alleges that BD misled investors by failing to

disclose material, adverse facts about the ongoing issues with the Alaris System and the impact that the necessary remediation efforts would have on the Company's financial position.

## THE REASONS THE STATEMENTS WERE IMPROPER

77.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     that the Company's Alaris System was experiencing software errors and other alarm prioritization matters;

(b)     that these "errors" could "cause serious adverse consequences or death";

(c)     that the Company would have to invest in remediation efforts to correct the defects;

(d)     that such remediation efforts would likely be delayed due to regulatory scrutiny;

(e)     that the Company would have to recall the defective pumps; and

(f)     as a result of the foregoing, representations concerning planned "improvements" and "upgrades" of the Alaris System were improper.

## INSIDER SALES BY DEFENDANTS FORLENZA AND POLEN

78.     Rather than providing the market with correct information, defendants Forlenza and Polen used their knowledge of BD's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers of BD, defendants Forlenza and Polen were privy to material, nonpublic information about the Company's true business health.

79.     While in possession of this knowledge, defendant Forlenza sold 198,137 shares of his personally held BD stock for proceeds of over $54.6 million.  Defendant Forlenza's sales were timed to maximize profit from BD's then artificially inflated stock price.  Defendant Forlenza's sales are suspicious given that he started selling his stock just two weeks after entering into a 10b5-1 plan.  Further adding to the auspicious timing of his sales, defendant Forlenza's stock sales represented almost 50% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 205,498 |
| Shares Sold During the Sales Period ("SP") | 198,137 |
| Shares Disposed (Other) During SP | 13,376 |
| Total Shares Held During SP | 420,377 |
| Shares Remaining SP | 208,864 |
| **Total Proceeds from Sales** | **$54,668,240.95** |
| **% of Total Ownership Sold During SP** | **47.13%** |

80.     While in possession of this knowledge, defendant Polen sold 13,907 shares of his personally held BD stock for proceeds of over $3.7 million.  Defendant Polen's sales were timed to maximize profit from BD's then artificially inflated stock price.  Defendant Polen's sales are suspicious given that his stock represented nearly 40% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 16,455 |
| Shares Sold During SP | 13,907 |
| Shares Disposed (Other) During SP | 3,768 |
| Total Shares Held During SP | 34,792 |
| Shares Remaining SP | 17,117 |
| **Total Proceeds from Sales** | **$3,749,744.41** |
| **% of Total Ownership Sold During SP** | **39.97%** |

81.     In sum, defendants Forlenza and Polen sold over $58.4 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **FORLENZA**<br>**Current Chairman of**<br>**the Board** | 12/12/2019 | 4,717 | $265.57 | $1,252,693.69 |
| | 12/12/2019 | 11,626 | $265.57 | $3,087,516.82 |
| | 1/2/2020 | 12,083 | $271.28 | $3,277,876.24 |

| | | | | |
|---|---|---|---|---|
| | 1/2/2020 | 33,365 | $271.28 | $9,051,257.20 |
| | 1/8/2020 | 4,923 | $275.19 | $1,354,760.37 |
| | 1/8/2020 | 13,860 | $275.19 | $3,814,133.40 |
| | 1/10/2020 | 6,990 | $275.15 | $1,923,298.50 |
| | 1/10/2020 | 19,675 | $275.15 | $5,413,576.25 |
| | 1/23/2020 | 2,180 | $280.06 | $610,530.80 |
| | 1/23/2020 | 6,284 | $280.06 | $1,759,897.04 |
| | 1/24/2020 | 2,489 | $280.13 | $697,243.57 |
| | 1/24/2020 | 7,177 | $280.13 | $2,010,493.01 |
| | 1/27/2020 | 8,860 | $280.09 | $2,481,597.40 |
| | 1/27/2020 | 25,546 | $280.09 | $7,155,179.14 |
| | 1/28/2020 | 9,848 | $280.96 | $2,766,894.08 |
| | 1/28/2020 | 28,514 | $280.96 | $8,011,293.44 |
| | **Total:** | **198,137** | **Total:** | **$54,668,240.95** |
| | | | | |
| **POLEN** **Current President &** **Chief Executive Officer** | 12/16/2019 | 1,953 | $269.63 | $526,587.39 |
| | 12/16/2019 | 1,954 | $269.63 | $526,857.02 |
| | 12/16/2019 | 5,568 | $269.63 | $1,501,299.84 |
| | 12/16/2019 | 4,432 | $269.63 | $1,195,000.16 |
| | **Total:** | **13,907** | **Total:** | **$3,749,744.41** |
| | | | | |
| | | | | |
| | **Total:** | **212,044** | **Total:** | **58,417,985** |

## DAMAGES TO BD

82.　　As a result of the Individual Defendants' improprieties, BD disseminated improper, public statements concerning its compliance with the FDA's requirements for its Alaris System, the true extent of the Alaris System's safety issues, and the impact recall and remediation would have on its financials.   These improper statements have devastated BD's credibility as reflected by the Company's almost $10.6 billion, or 13.6%, market capitalization loss.

83.　　The Company's involvement in an alleged conspiracy to fix prices for certain products and its failure to timely disclose material information to investors exposes BD to significant reputational damage within the business community and in the capital markets.   In addition to price and product quality, BD's current and potential customers consider a company's ability to curb known abuses and implement adequate controls to ensure illegal practices are

timely discovered and properly addressed. Customers are less likely to do business with companies that knowingly permit and/or encourage unscrupulous and harmful behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information. BD's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

84. Further, as a direct and proximate result of the Individual Defendants' actions, BD has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred investigating and defending BD and certain officers and directors in the Vertical Conspiracy Action, plus potentially hundreds of millions of dollars in a settlement or to satisfy an adverse judgment;

(b) costs incurred to upgrade the Alaris System's software including regulatory approval, which BD has identified will cost the Company at least $59 million;

(c) costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws; and

(d) costs incurred from compensation and benefits paid to the defendants who have breached their duties to BD.

## **DERIVATIVE AND DEMAND REFUSED ALLEGATIONS**

85. Plaintiff brings this action derivatively in the right and for the benefit of BD to redress injuries suffered, and to be suffered, by BD as a direct result of breaches of fiduciary

duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  BD is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86.     Plaintiff will adequately and fairly represent the interests of BD in enforcing and prosecuting its rights.

87.     Plaintiff was a stockholder of BD at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current BD stockholder.

**Demand Requirement Under Section 14A:3-6.3 of the New Jersey Revised Statutes**

88.     Section 14A:3-6.3 of the New Jersey Revised Statutes provides that a stockholder may commence a derivative proceeding after:  "(1) a written demand has been made upon the corporation to take suitable action; and (2) 90 days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period."

89.     Here, as demonstrated below, plaintiff has alleged with particularity that: (i) he made a demand on the BD Board to take action; and (ii) the Board ignored the Demand for at least ninety days.  Nothing more is required.

**Plaintiff's Demand**

90.     In accordance with New Jersey law, on April 21, 2020, plaintiff sent the Demand to the Board to investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for mismanagement and breaches of fiduciary duties.  Plaintiff urged the Board to commence these legal proceedings as expeditiously

as possible, and to secure tolling agreements from all potential defendants. To date, the Board has not substantively responded to the Demand.

91. On or about September 4, 2020, counsel for plaintiff talked with outside counsel for the Company. Counsel for BD stated that due to a "COVID-related glitch," the Board did not become aware of the Demand until September 2, 2020. Counsel stated that the Board would review the Demand.

92. On October 14, 2020, the Company's counsel informed plaintiff that the Board formed a Special Committee to consider the Demand. A true and correct copy of the e-mail chain between plaintiff's and Company's counsel informing plaintiff of the formation of the Special Committee and memorializing the September 4, 2020 conversation is attached hereto as Exhibit B.

93. On or about November 9, 2020, plaintiff's counsel spoke with counsel for the Special Committee. Other than counsel's introduction, the call provided no additional information. Plaintiff has not heard from the Special Committee or the Company since that day. Plaintiff has not even received a formal letter acknowledging the Special Committee's investigation, identifying who is on the Special Committee, or any formal documentation setting forth the Special Committee's authority and scope of its investigation.

94. On January 4, 2021, counsel for the Special Committee e-mailed plaintiff's counsel that the Special Committee was "making good progress." Plaintiff expressed disappointment that the Special Committee was only making "good progress" given how much time had passed since he made his Demand. In the e-mail exchange that followed, plaintiff's counsel noted that the Special Committee's counsel never responded to their request for information that they requested during a call with Special Committee's counsel, including such

basic information as the identity of the Special Committee and the documentation empowering the Special Committee.

95.     Counsel for the Special Committee replied on January 6, 2020, once again refusing to provide any of the requested information.  Plaintiff pointed out counsel's nonresponse in his reply e-mail sent that same day.

96.     Finally, on January 11, 2020, counsel for the Special Committee finally revealed that its members are Eckert, Henderson, and Melcher.  With this information, the reason for the delay in identifying the Special Committee members became apparent.  The Board was free to choose anyone that it wanted to conduct the investigation, including appointing new, untainted Board members.  Instead, the Board appointed three individuals that had served on the Company for years, including, during the entire time the Individual Defendants were making the above detailed false statements.  Since the Board is charged with the ultimate oversight of the Company, including the statements by the Individual Defendants, in order to do a good faith investigation, the Special Committee members would have to investigate themselves.  This position is untenable and thus the investigation cannot be done in good faith and independently in light of the Special Committee members.

97.     Nine months—three times the statutory period—have now passed since plaintiff sent the Demand, yet the Board has not provided a substantive response despite the obligation under section 14A:3-6.3 to respond to the Demand within ninety days.[2]  Even if plaintiff accepts that the "COVID-related glitch" delayed the Board's consideration, over ninety days have passed since the Board claims it became aware of the Demand.  The Board's failure to respond to the

---

[2] Under the statutory requirements, the required ninety-day period expired July 20, 2020.

Demand is contrary to New Jersey law, and this delay demonstrates that the Board is acting in bad faith in considering the Demand. Accordingly, no further delay is warranted or appropriate here, and thus, in accordance with New Jersey law, plaintiff is entitled to pursue this action.

98.     Plaintiff has not made any demand on the other stockholders of BD to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     BD is a publicly held company with over 290 million shares outstanding and thousands of stockholders as of October 31, 2020;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    The Individual Defendants owed and owe BD fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe BD the highest obligation of care and loyalty.

101.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

102.    The Individual Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Individual

Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) that BD had engaged in anticompetitive conduct to suppress competition in the market for conventional and safety syringes and safety IV catheters; (ii) the true extent to which the Company had violated the Consent Decree; (iii) the harm to customers that would result from the Alaris System's defects; and (iv) the financial impact these violations would have on the Company. Accordingly, the Individual Defendants breached their duty of care and loyalty to the Company.

103.    Defendants Forlenza and Polen breached their duty of loyalty by selling BD stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which defendants Forlenza and Polen used for their own benefit when they sold BD common stock.

104.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BD has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

105.    Plaintiff, on behalf of BD, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of BD. The Individual Defendants were unjustly

enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to BD.

108.    Defendants Forlenza and Polen sold BD stock while in possession of material, nonpublic information that artificially inflated the price of BD stock.  As a result, defendants Forlenza and Polen profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

109.    Plaintiff, as a stockholder and representative of BD, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

110.    Plaintiff, on behalf of BD, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of BD, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B.    Directing BD to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BD and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over the pricing of products sold through the BD Medical business segment;

2. a proposal to strengthen the Company's antitrust policies;

3. a proposal to strengthen the Company's controls over financial reporting;

4. a proposal to strengthen the Company's oversight of its disclosure procedures;

5. a provision to control insider selling;

6. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

7. a provision to permit the stockholders of BD to nominate at least three candidates for election to the Board;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of BD has an effective remedy;

D. Awarding to BD restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 24, 2021                  HERMAN JONES LLP

*Serina M. Vash*
SERINA M. VASH (NJ Bar. No. 041142009)
153 Central Avenue #131
Westfield, NJ 07090
svash@hermanjones.com
Telephone: (404) 504-6516
Facsimile: (404) 504-6501

HERMAN JONES LLP
JOHN C. HERMAN (GA Bar No. 348370)*
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
Telephone:  (404) 504-6500
Facsimile:  (404) 504-6501

ROBBINS LLP
BRIAN J. ROBBINS*
CRAIG W. SMITH*
SHANE P. SANDERS*
EMILY R. BISHOP*
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

*pro hac vice motions to be filed*

1503925

- 39 -